AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1750 Princeton Drive, Dayton Ohio 45406<br>including all outbuildings, garages,<br>and vehicles within the curtilage | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **3 : 26 MJ 095**

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Distribution and possession with intent to distribute a controlled substance |
| 21 USC 846 | Conspiracy to distribute/possess with intent to distribute a controlled substance |
| 21 USC 843(b) | Use of a communication facility to commit a felony |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested

under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**TYLER J SIMPSON**  Digitally signed by TYLER J SIMPSON
Date: 2026.03.09 10:42:11 -04'00'

*Applicant's signature*

SA Tyler Simpson, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone (reliable electronic means).

Date: 3/9/26

*Judge's signature*

City and state: Dayton, Ohio

PBS

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF:

1750 Princeton Drive, Dayton Ohio 45406
including all outbuildings, garages, and vehicles
within the curtilage

Case No. 3:26 MJ 095

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Tyler Simpson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for an anticipatory warrant to search the premises known as 1750 Princeton Drive., Dayton, Ohio 45406, including all outbuildings, garages, and vehicles within the curtilage hereinafter "PREMISES", as further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the United States Department of Homeland Security ("DHS")/ Homeland Security Investigations ("HSI"), presently assigned to the Office of the Assistant Special Agent in Charge, Cincinnati, Ohio ("HSI Cincinnati"). I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I entered on duty in September 2023 as an HSI Special Agent ("SA") assigned to the Office of the Assistant Special Agent in Charge, with HSI Cincinnati in September 2023. As part of my daily

1

duties as a HSI SA, I investigate narcotics offenses in violation of 21 USC § 841(a)(1). I have received training in the area of federal narcotics offenses, and I am a graduate of the Federal Law Enforcement Training Centers' ("FLETC") Criminal Investigator Training Program and the FLETC HSI Special Agent Training Program. From August 2019 through August 2022, I was assigned to the HSI Border Enforcement Security Task Force (BEST) as a HSI Task Force Officer, primarily operating in Dayton, OH. Prior to my tenure with HSI, I was employed as a police officer for Miami Township Police Department in Miamisburg, Ohio starting in September of 2012, until September of 2023. During my time as a police officer, I was tasked with investigating crimes, ranging from narcotics violations to homicide investigations. I have received numerous advanced trainings in the forms of drug investigations and interrogations. I have over 250 hours of criminal interdiction training from various experts in the respective field. As a Special Agent for HSI, I am charged with the duty of enforcing among other Titles, the Controlled Substance Act, Title 21, United States Code, together with other assigned duties as imposed by federal law. By virtue of my employment with the HSI, I perform and have performed various tasks which include, but are not limited to: Conducting surveillance for the primary purpose of observing the movements of drug traffickers and those suspected of trafficking in drugs; Functioning as a case agent which entails the supervision of specific aspects of drug investigations; and, Tracing and tracking monies and assets gained by drug traffickers from the illegal sale of drugs. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested

2

warrant and does not set forth all of my knowledge about this matter. I have also conducted and/or participated in federal investigations involving drug trafficking, firearms offenses, and child exploitation. I have also participated in numerous state-level investigations and operations involving the same.

3.      As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the PREMISES:

a.      Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.      Conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846;

c.      Use of a communication facility to commit a Title 21 offense, in violation of Title 21, United States Code, Section 843(b).

4.      Based on my training and experience, as described above, as well as the facts detailed in this affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the PREMISES described above.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3

**PROBABLE CAUSE**

6.　　Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source. The following statements are derived from either my personal knowledge of or participation in the investigation or from the statements/reports of other investigators and law enforcement officers.

7.　　Since May of 2025, Homeland Security Investigations (HSI) Task Force Officer (TFO) Miller has been conducting a narcotics investigation involving the overdose death of an individual whose identity is known to me that took place in Beavercreek, Greene County, Ohio, on or about the 29th of April 2025. TFO Miller, through various investigative means, was able to identify Keshawn RIVERS, of Dayton, Ohio, social security number and date of birth known to law enforcement through the investigation, but not included in this affidavit, as a suspect who sold fentanyl to the deceased in the same time frame of his overdose death.

8.　　During the investigation, TFO Miller was able to recruit a confidential source (CS) who knew RIVERS and has historically purchased fentanyl from RIVERS. The CS[1] agreed to cooperate with law enforcement to conduct controlled purchases of fentanyl from RIVERS. The CS referred to throughout this affidavit is the same CS discussed in this paragraph.

---

[1] CS has provided information throughout this investigation that has been independently corroborated by law enforcement. Based on this, I believe that CS is truthful and reliable. CS has a criminal history that includes narcotics and solicitation offenses. CS is providing information for purposes of civic duty.

4

9. On July 25, 2025, TFO Miller and assisting Agents with the RANGE Task Force (RANGE TF) and HSI utilized the CS and a HSI Undercover Agent (UC1) to conduct a controlled purchase of approximately 2 grams of fentanyl from RIVERS in Montgomery County, Ohio.

10. Prior to and subsequent to the deal, the CS was searched for contraband, and nothing was located. The UC1 drove the CS to the deal location in West Carrolton, Ohio. The CS was provided with a quantity of recorded buy funds to purchase the fentanyl from RIVERS. Prior to the deal, the CS contacted RIVERS at telephone number 937-361-1313 to set up a purchase of fentanyl and was told where to go to complete the deal. The CS and UC1 were equipped with monitoring and recording equipment during the deal.

11. At the deal location, the CS got into the passenger seat of a black Audi Q5 (RIVERS' Audi) Ohio license plate KMM1982. The CS gave RIVERS the buy funds and was given baggies of off-white powder. RIVERS told the CS to be careful because the purported fentanyl was strong. CS subsequently provided the purported fentanyl to Agents. A subsequent registration check through Ohio Law Enforcement Gateway (OHLEG)[2] showed the black Audi Q5 referenced above was registered to Keshawn RIVERS showing a home address of 217 Westwood Avenue in Dayton, Ohio.

12. The CS confirmed RIVERS was the person that sold the fentanyl to CS due to the previous photo identification made and several known dealings with RIVERS. On July 16, 2025

---

[2] OHLEG is a law enforcement database that is a secure, web-based platform that provides Ohio law enforcement, prosecutors, and authorized personnel with essential investigative tools and data, and training. It acts as a central hub for sharing information to solve and prevent crimes, including features like driver's license photo searches.

5

TFO Miller, showed the CS a photo lineup with RIVERS as one of the six males in the lineup, but he/she could not identify RIVERS, however; on July 23, 2025, TFO Miller was looking through photos associated with 217 Westwood Avenue and the CS asked TFO Miller to stop scrolling and pointed out a photo of RIVERS. This is the same photo listed in the photo lineup. The CS was asked about not being able to identify the picture when it was in the photo lineup and the CS said they were nervous and missed the picture. The CS assured agents they were 100% sure the picture was RIVERS.

13.    The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

14.    On August 12, 2025, TFO Miller submitted a GPS search warrant, application, and affidavit via the Montgomery County Common Pleas Court search warrant portal for RIVERS' Audi, Ohio License plate number KMM1982. The Honorable Judge Ellis of the Montgomery County Common Pleas Court reviewed the warrant, application, and affidavit and granted TFO Miller a signed search warrant to place a GPS unit on RIVERS' Audi and monitor it for 60 days.

15.    On August 14, 2025, TFO Miller and Detective Dexter responded to the PREMISES in Dayton, Ohio to deploy a GPS unit to RIVERS' Audi pursuant to the signed search warrant discussed in the paragraph above. The PREMISES is an address associated with RIVERS and TFO Miller observed RIVERS' Audi in the driveway of the PREMISES on previous surveillance. Upon arrival, TFO Miller didn't observe any vehicles parked at the residence. TFO Miller responded to 217 Westwood Avenue, another house identified by TFO Miller for RIVERS. TFO Miller located RIVERS' Audi parked on the street in front of 217 Westwood Avenue and

6

deployed the GPS unit.

16. On August 15, 2025, TFO Miller and assisting Agents with HSI and RANGE TF attempted another controlled purchase of fentanyl from RIVERS. RIVERS didn't answer the phone call for the UC1, and the controlled purchase was cancelled. TFO Miller reviewed GPS tracks of RIVERS' Audi and noticed later in the evening of August 15, 2025, RIVERS' Audi was parked to the rear of 1425 Weaver Street in Dayton, Ohio. Throughout the next few days, TFO Miller observed that RIVERS' Audi had not moved from the Weaver Street address.

17. On August 19, 2025, TFO Miller responded to the PREMISES to conduct surveillance. TFO Miller observed a new model Chevy Silverado (RIVERS' Silverado) parked in the driveway of the residence. TFO Miller conducted a registration check through OHLEG and observed RIVERS had recently registered a 2022 Chevy Silverado in his name to 217 Westwood Avenue. OHLEG listed the license plate number as Ohio KHQ6698.

18. On August 20, 2025, TFO Miller submitted a GPS search warrant, application, and affidavit for RIVERS' Silverado Ohio license plate KQH6698 to the Montgomery County Common Pleas Court search warrant portal to be reviewed by a judge. The Honorable Judge Parker of the Montgomery County Common Pleas Court reviewed the warrant, application, and affidavit and granted TFO Miller a signed search warrant to place a GPS unit on RIVERS' Silverado and monitor it for 60 days.

19. On August 21, 2025, TFO Miller and Detective Dexter with RANGE TF found RIVERS' Silverado parked in the driveway of the PREMISES, Dayton, Ohio, a residence associated with RIVERS and deployed a GPS unit on the listed truck.

7

20. On September 18, 2025, TFO Miller and the RANGE TF utilized the CS (same CS discussed above) and a RANGE TF undercover (UC2) detective to conduct a controlled purchase of 2 grams of fentanyl from RIVERS that took place in the area of 143 Martz Avenue, Dayton, Ohio.

21. Prior to and subsequent to the deal, the CS was searched and no contraband was located. The UC2 drove the CS to the deal location. The UC2 and CS were equipped with monitoring and recording equipment. The CS contacted RIVERS at 937-361-1313 to purchase fentanyl and was directed to the area of 143 Martz Avenue to complete the deal.

22. At the deal location, Agents conducting surveillance observed an unknown female exit 143 Martz Avenue, approach a black Nissan Sentra (RIVERS' Nissan) Ohio license plate number KSW5865, and retrieve something from the driver.

23. The female walked to the UC2 vehicle which the CS was also in and made contact with the CS at the passenger window. The CS exchanged recorded buy funds for a baggy of suspected fentanyl. CS subsequently provided the purported fentanyl to Agents.

24. TFO Miller conducted a subsequent registration check and learned RIVERS' Nissan was registered to RIVERS showing a home address of 217 Westwood Avenue.

25. The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

26. A review of RIVERS' Silverado GPS data during the deal showed his truck parked at White Allen Chevrolet Dealership in Dayton. Ohio.

27. A review of RIVERS' Audi GPS data during the deal showed the Audi parked in

8

the rear of 217 Westwood Avenue.

28.     On October 1, 2025, TFO Miller and the RANGE TF utilized the CS (same CS discussed previously) and UC2 to conduct a controlled buy walk of approximately 4 grams of fentanyl from RIVERS that took place in the area of Ashley Street and Rubicon Road in the City of Dayton, Ohio.

29.     Prior to and subsequent to the deal, the CS was searched and no contraband was located. The UC2 drove the CS to the deal location. The UC2 and CS were equipped with monitoring and recording equipment. The CS contacted RIVERS at 937-361-1313 to arrange a purchase of fentanyl and was directed to the area of Ashley Street and Rubicon Road in Dayton to complete the deal.

30.     At the deal location, Agents conducting surveillance observed RIVERS' Nissan parked on Ashley Street. The CS exited the UC2's vehicle and got into the passenger seat of RIVERS' Nissan. Inside RIVERS' Nissan, the CS gave RIVERS the recorded buy funds and was handed the purported fentanyl. The CS asked RIVERS if his (RIVERS') number could be passed to the person (UC2) driving the CS to the deal location. RIVERS tells the CS to give his (RIVERS') number to the UC2. The CS subsequently provided the purported fentanyl to Agents. The CS confirmed RIVERS sold the fentanyl to the CS.

31.     On the same day, the UC2 called RIVERS who confirmed he/she (UC2) can call directly to RIVERS to order fentanyl.[3]

---

[3] All controlled narcotics purchases after October 1, 2025 occurred between RIVERS and the UC2 referenced during the October 1, 2025 controlled narcotics purchase.

9

32.     The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

33.     A review of GPS data for RIVERS' Silverado during the deal showed the truck was parked to the rear of 217 Westwood Avenue.

34.     A review of GPS data for RIVERS' Audi during the deal showed the vehicle parked to the rear of 217 Westwood Avenue.

35.     On October 8, 2025, TFO Miller and RANGE TF utilized UC2 to conduct a controlled purchase of approximately 4 grams of fentanyl from RIVERS that took place in the area of 30 Gramont Avenue in the City of Dayton, Ohio.

36.     The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the area of 30 Gramont Avenue and had the UC pull into the alley between Gramont Avenue and Anna Avenue.

37.     The UC2 observed RIVERS arrive on foot appearing to come through the bush line behind 30 Gramont Avenue. The UC2 handed RIVERS the recorded buy funds and was handed a quantity of purported fentanyl.

38.     The UC2 confirmed RIVERS was the person that sold the fentanyl to the UC2. The UC2 recognized RIVERS from a photograph and the October 1, 2025 controlled narcotics purchase discussed previously in this affidavit. The UC2 confirmed the person who sold he/she the fentanyl due to being shown a driver's license photo of RIVERS from previous operations and the current briefing of this narcotics purchase operation.

10

39.     The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

40.     A review of GPS data showed RIVERS' Audi at the deal location during the deal. Agents conducting surveillance observed the Audi parked on Gramont Avenue.

41.     A review of the GPS data prior to the deal showed RIVERS' Audi parked at the PREMISES in the early morning hours (approximately 7:21am). A review of the data subsequent to the deal showed RIVERS' Audi parked at 217 Westwood Avenue between the hours of 5:53pm and 6:29pm approximately.

42.     A review of GPS data of RIVERS' Silverado showed the Silverado parked at a car stereo shop in Moraine, Ohio, during the timeframe of the narcotics purchase.

43.     On October 10, 2025, TFO Miller renewed the GPS search warrant for RIVERS' Audi. The Honorable Judge Ellis of the Montgomery County Common Pleas Court reviewed and signed the search warrant granting TFO Miller an additional 60 days to monitor RIVERS' Audi.

44.     On October 17, 2025, TFO Miller renewed the GPS search warrant for RIVERS' Silverado. The Honorable Judge Henne of the Montgomery County Common Pleas Court reviewed and signed the search warrant granting TFO Miller an additional 60 days to monitor RIVERS' Silverado.

45.     On October 20, 2025, TFO Miller and RANGE TF were in the area of 140 West Norman Street conducting a separate law enforcement operation. TFO Miller was familiar with the area from the RIVERS case as GPS data showed RIVERS' Audi and Silverado frequently in this area and staying for short periods of time.

11

46. At approximately 1:40pm, TFO Miller observed RIVERS' Silverado parked in front of 140 West Norman Street. While traveling west on the street, TFO Miller observed a male get into the passenger seat of RIVERS' Silverado and exit within less thirty seconds. The male walked to a vehicle, Ohio license plate number KSL3195, parked in front of RIVERS' Silverado and left the area. The Driver of RIVERS's Silverado stayed parked in the Silverado as TFO Miller passed by in an unmarked police vehicle.

47. Based on training and experience, TFO Miller knows short term vehicular traffic is indicative of illegal activity including but not limited to drug trafficking. TFO Miller conducted a registration check of the vehicle, Ohio license plate number KSL3195, leaving the area after the brief interaction described above. OHLEG showed the vehicle, a 2001 Ford SUV, was registered to Individual A, known to law enforcement but withheld from this affidavit, at a home address in Kettering, Ohio. A criminal history check showed Individual A has been arrested numerous times throughout the greater Dayton area for crimes including but not limited to possession of drugs (6 times), possession of drug paraphernalia, and possession of drug abuse instruments.

48. TFO Miller reviewed GPS data for the timeframe of prior to and after the brief interaction described above. The GPS data on RIVERS' Silverado showed the Silverado was located around 140 West Norman Street during this timeframe.

49. GPS data showed RIVERS' Silverado located in the early morning hours at approximately 6:23am around the PREMISES.

50. GPS data from October 20, 2025, showed RIVERS' Silverado traveled to the area of 140 West Norman Street approximately five additional times, only staying short periods of time

12

each time RIVERS' Silverado was in the area.

51.     GPS data from October 20, 2025, on RIVERS' Silverado also showed RIVERS' Silverado traveled to the area of 30 Gramont Avenue and stayed for a short period of time, less than 30 minutes. As noted above, 30 Gramont is the area RIVERS met with the UC2 on October 8, 2025 to sell fentanyl to the UC2.

52.     GPS data from October 20, 2025, showed RIVERS' Audi parked in the rear of 217 Westwood Avenue and that RIVERS' Audi had not moved all day.

53.     On October 21, 2025, TFO Miller and the RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 9 grams of fentanyl from RIVERS that took place around South Conover Street and Fifth Street in the City of Dayton, Ohio.

54.     The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the area of South Conover Street and Fifth Avenue and had the UC2 pull to the side of the road. Surveillance units and GPS data showed RIVERS' Silverado in the area at the same time.

55.     The UC2 observed RIVERS' Silverado in the same area and an unknown male exited the passenger seat of RIVERS' Silverado. The UC2 handed the unknown male recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

56.     The UC2 left the deal location and was contacted by RIVERS who explained how much fentanyl was in each baggy. The UC2 recognized RIVERS' voice from the phone call and RIVERS called the UC using the same phone number the UC2 called and spoke to RIVERS on

13

earlier in the day (phone number ending in 1313).

57.     The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

58.     A review of GPS data from October 21, 2025, of RIVERS' Silverado showed RIVERS' Silverado parked at the PREMISES overnight.

59.     A review of GPS data during the deal, RIVERS' Audi was parked to the rear of 217 Westwood Avenue.

60.     On October 27, 2025, TFO Miller and the RANGE TF utilized UC2 to conduct a controlled purchase of approximately 9 grams of fentanyl from RIVERS that took place around 140 West Norman Street in the City of Dayton, Ohio.

61.     Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to exit on Main Street and call back.

62.     The UC2 called RIVERS back who directed UC2 to 140 West Norman Street to complete the deal. Upon arriving at 140 West Norman Street, the UC2 parked near RIVERS' Silverado and got into the passenger seat of RIVERS' Silverado.

63.     The UC2 handed RIVERS recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

64.     The UC2 confirmed RIVERS was the person that sold the fentanyl to the UC2.

65.     The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

14

66. A review of GPS data on RIVERS' Silverado showed the data ended in the early morning hours prior to the deal, presumably as a result of the GPS battery having run out of charge.

67. A review of GPS data showed that RIVERS' Audi was parked to the rear of 217 Westwood Avenue during the timeframe of the deal.

68. A review of GPS data on RIVERS' Audi from later that evening, showed RIVERS' Audi started to move at approximately 6:00pm from 217 Westwood Avenue and traveled to the area of 140 West Norman Street twice prior to approximately 10:00pm.

69. A review of GPS data on RIVERS' Audi showed the vehicle parked around the PREMISES at approximately 12:54am on October 28, 2025 and started to move again at approximately 8:47am on October 28, 2025.

70. On November 26, 2025, TFO Miller and the RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 15 grams of fentanyl from RIVERS that took place around 140 West Norman Street in the City of Dayton, Ohio.

71. The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to exit on Main Street and call back.

72. The UC2 called RIVERS back and was directed to 140 West Norman Street to complete the deal.

73. The UC2 pulled up to the deal location and observed RIVERS' Nissan parked near 140 West Norman Street. Note, RIVERS utilized the same Nissan (RIVERS' Nissan) during previous deals with the UC2 referenced earlier in this affidavit.

15

74. The UC2 approached RIVERS' Nissan, in which RIVERS is seated in the driver's seat. The UC2 handed RIVERS recorded buy funds through the front passenger window of RIVERS' Nissan and was given numerous baggies of off-white powder of purported fentanyl.

75. The UC2 confirmed RIVERS as the person selling the fentanyl to the UC2.

76. The purchased substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl.

77. As of this date, both GPS units on RIVERS' Silverado and RIVERS' Audi had run out of battery and have not been replaced. So, no data could be reviewed for the transaction time.

78. On December 2, 2025, TFO Miller received subpoenaed information from AES (Dayton area electricity provider) for subscriber of electricity information for 217 Westwood Avenue and the PREMISES. TFO Miller also subpoenaed payment information for the two residences.

79. AES records showed 217 Westwood Avenue's electricity was in the name of Keshawn RIVERS. AES records showed RIVERS had electricity at 217 Westwood Avenue in his name since 2013.

80. Per AES records, RIVERS listed he was unemployed. The last payment for 217 Westwood Avenue, during the subpoenaed time period, showed an online payment through "EZ-PAY' on November 11, 2025. The payment showed an email of bdrymn@gmail.com. The payment, $255.40, was made online at approximately 1:57am with card ending in #5983.

81. AES records showed the PREMISES was in the name of a woman's whose name is known to me but who shall be identified for purpose of this affidavit as B.R. AES records showed

16

a billing address for the PREMISES' utility bill as "4865 Farhills Ave Apt 1 Dayton Ohio 45429."

82. TFO Miller knows that B.R. listed herself as Keshawn RIVERS' legal guardian during a police report (missing juvenile) found on Dayton Police Department's Management Information Systems (MIS) when he (RIVERS) was a juvenile.

83. The last payment for the PREMISES during the subpoenaed time period showed an online payment through "EZ-PAY" on November 11, 2025. The payment showed an email of bdrymn@gmail.com. The payment, $258.46, was made online at approximately 2:10am (approximately 13 minutes after the payment for the electricity at 217 Westwood Avenue) with card ending in #5983, the same card used when paying for the electricity for 217 Westwood Avenue.

84. TFO Miller notes the CS utilized in this case advised RIVERS would take payment for narcotics via a cash app. CS provided RIVERS' display name as "Body" and the cash tag as "@$bdrymn". The cash tag name is similar to the listed email address on the AES online payments.

85. On December 4, 2025, at approximately 9:30am, TFO Miller conducted surveillance at the PREMISES. Upon arrival, TFO Miller observed RIVERS' Audi parked in the driveway and backed up to the garage door. At approximately 9:41am, TFO Miller observed RIVERS exit the front door of the residence and get into the driver seat of RIVERS' Audi. RIVERS was wearing an oversized coat and had both hands in the coat pockets. RIVERS started the Audi and sat in the driveway for a few minutes prior to traveling east on Princeton Drive. TFO Miller didn't follow RIVERS at this time.

86. At approximately 9:52am (after seeing RIVERS exit the PREMISES) the UC2

17

placed a recorded call to RIVERS at telephone number 937-361-1313 to see if he (RIVERS) was ready to meet and had fentanyl for sale. RIVERS confirmed he would be ready to complete the deal and told the UC2 to call back when the UC2 got close. Due to operational needs, Agents could not complete the deal until later in the day.

87.     At approximately 2:29pm on December 4, 2025, TFO Miller and RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 9 grams of fentanyl from RIVERS that took place near the intersection of West Mumma Avenue and Viola Avenue in the City of Dayton, Ohio.

88.     As noted above, earlier that day the UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to exit on Main Street and to call back when UC2 got close.

89.     The UC2 called RIVERS back and was directed to turn onto West Mumma Avenue and pull behind his (RIVERS') Audi.  The UC2 pulled up to the deal location and observed RIVERS' Audi parked near the stop sign on West Mumma Avenue and Viola Avenue.

90.     The UC2 handed RIVERS recorded buy funds through the front passenger window and was given numerous baggies of off-white powder of purported fentanyl.

91.     The UC2 confirmed RIVERS as the person who sold the fentanyl to the UC2.

92.     The purchased substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl. The lab report also indicated that Carfentanil was present.

93.     On the same date (December 4, 2025), after the controlled purchase referenced

18

above, Detective Williams and members of RANGE TF conducted surveillance at 217 Westwood Avenue. Detective Williams, who had also been present during all the previous controlled purchases with RIVERS, advised RIVERS' Nissan and RIVERS' Silverado were parked between 217 Westwood Avenue and the rear detached garage. Detective Willams noticed what appeared to be a black Cadillac SUV also parked in the same area but that the vehicle was snow covered. Detective Williams stated that neither RIVERS' Nissan nor RIVERS' Silverado had snow on them (the Dayton area recently had a large snowstorm).

94. On December 11, 2025, TFO Miller and the RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 9 grams of fentanyl from RIVERS that took place near the intersection of East Hudson Avenue and East Emerson Avenue in the City of Dayton, Ohio.

95. The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC to exit on Main Street and to call back.

96. The UC2 called RIVERS back and was directed to the area of East Hudson Avenue and East Emerson Avenue.

97. The UC2 pulled up to the deal location, after which RIVERS' Audi pulled up and parked behind the UC2 vehicle.

98. The UC2 got into RIVERS' Audi and handed RIVERS recorded buy funds. RIVERS handed the UC2 purported fentanyl.

99. The UC2 told RIVERS he/she (the UC2) had a little extra money and asked for

19

more fentanyl. RIVERS took off his left shoe and pulled more fentanyl out of the bottom and sold it to the UC2.

100.   The UC2 confirmed RIVERS was the person selling the fentanyl to the UC2.

101.   The purchased substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl.

102.   On December 18, 2025, TFO Miller and the RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 12 grams of fentanyl from RIVERS that took place near 140 West Norman Street in the City of Dayton, Ohio.

103.   The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to exit on Main Street and to call back.

104.   The UC2 called RIVERS back who directed the UC2 to the area of 140 West Norman Street.

105.   The UC2 pulled up to the deal location and observed RIVERS' Silverado.

106.   The UC2 parked behind RIVERS' Silverado and got into the passenger side of RIVERS' Silverado.

107.   The UC2 handed RIVERS the buy funds and was given numerous baggies of fentanyl.

108.   The UC2 confirmed RIVERS as the person who sold the fentanyl to the UC2.

109.   After the deal with the UC2, Agents conducting surveillance observed RIVERS conduct another short-term meeting with an unknown female in the area of West Norman Street.

20

Based on the Agents' training and experience, this second short-term meeting between RIVERS and the unknown female was likely another drug deal.

110. The purchased substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl.

111. On December 30, 2025, TFO Miller and RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 12 grams of fentanyl from RIVERS that took place at the Waffle House, located at 2226 Needmore Road in Dayton, Ohio.

112. The UC2 contacted RIVERS at telephone number 937-361-1313 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to come to the Waffle House on Needmore Avenue to complete the deal.

113. The UC2 called RIVERS back after getting off the Needmore Road exit, and RIVERS directed the UC2 to RIVERS' Nissan parked in the lot of the Waffle House.

114. The UC2 parked next to RIVERS' Nissan and walked to the passenger side of RIVERS' Nissan, opened the door, and the UC2 leaned in the door.

115. The UC2 handed RIVERS the buy funds and was given numerous baggies of fentanyl.

116. The UC2 confirmed RIVERS as the person who sold the fentanyl to the UC2.

117. The purchased substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl.

118. On January 6, 2026, a person believed to be RIVERS contacted the UC2 via text from a new telephone number: 937-474-2208. The text message told the UC2 to contact this new

21

number from now on and reminded the UC2 they just met at Waffle House last time (referenced in the above paragraphs).

119. On December 29, 2025, RANGE TF and the Montgomery County Human Trafficking Task Force executed a search warrant at 10 Maylan Drive in Dayton, Ohio in reference to a wanted fugitive. During this operation, TFO Miller advised Agents serving the warrant that when the GPS units attached to RIVERS' Silverado and Audi were active, both vehicles would travel to 10 Maylan Drive and stay for short periods. Based on training and experience, these short stays were consistent with drug trafficking activity.

120. Detective Williams, present during the search warrant and fugitive arrest on December 29, 2025, spoke with person(s) in the house (10 Maylan Drive) about the drug usage. A female in the house identified Keshawn RIVERS as her fentanyl supplier. The female confirmed RIVERS' identity stating his face was disfigured (due to a fireworks accident and now scarred) and identified three vehicles RIVERS would utilize to deliver fentanyl to the house (10 Maylan Drive). The three vehicles identified were a Nissan sedan, a Chevy Silverado and an Audi, all vehicles RIVERS has used to meet with the UC2 during narcotic purchases (referred to as RIVERS' Nissan, RIVERS' Silverado, and RIVERS' Audi in this affidavit). Throughout the investigation, law enforcement were able to verify RIVERS has scarring on his face.

121. On January 13, 2026, TFO Miller and RANGE TF utilized the UC2 to conduct a controlled purchase of approximately 10 grams of fentanyl from RIVERS that took place in the area of 135 West Norman Street in Dayton, Ohio.

122. The UC2 contacted RIVERS at new telephone number 937-474-2208 (referenced

in the above paragraphs of this affidavit) and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to come to Main Street and give him (RIVERS) a call.

123. The UC2 called RIVERS back after getting off onto Main Street. RIVERS directed the UC2 to West Norman Street.

124. The UC2 parked in front of RIVERS' Nissan and walked to the passenger side and got into the vehicle.

125. The UC2 handed RIVERS the buy funds and was given numerous baggies of purported fentanyl.

126. The confirmed RIVERS as the person selling the fentanyl to the UC2.

127. The substance was sent to the Miami Valley Regional Crime Lab for analysis and confirmed to be fentanyl.

128. Agents conducting surveillance, observed RIVERS circle the block a few times and had two other short-term meetings with two unknown females. Surveillance showed both contacted RIVERS at his vehicle for less than one minute. Based on the Agents' training and experience, these short term meetings between RIVERS and the unknown females were consistent with drug deals.

129. On January 21, 2026, TFO Miller and the RANGE TF attempted another controlled purchase from RIVERS. At approximately 8:00am, TFO Miller traveled to 217 Westwood Avenue to conduct surveillance and see if RIVERS could be seen leaving 217 Westwood Avenue prior to the deal. Upon arrival, none of RIVERS' vehicles were observed in the area. It should be noted

that RIVERS has an eight-foot privacy fence to the rear of 217 Westwood Avenue and a two-car detached garage. TFO Miller traveled to the PREMISES to see if RIVERS' vehicles might be parked in the driveway of that residence. No vehicles were observed.

130.    TFO Miller returned to 217 Westwood Avenue to see if RIVERS might pull one of his vehicles out of the detached garage before the deal. At approximately 10:49am, TFO Miller observed RIVERS' Nissan pulling out of the detached garage and continue towards West Second Street. TFO Miller did not follow the vehicle from 217 Westwood Avenue S. RIVERS never returned the call to the UC2.

131.    During the initial interview with the CS, he/she told TFO Miller that he/she bought fentanyl from RIVERS at 217 Westwood Avenue. The CS advised he/she would approach 217 Westwood Avenue through the alley and contact RIVERS sometimes at a rear window of a vehicle. The vehicle would be parked in the alley behind 217 Westwood Avenue. The CS had been with RIVERS in the earlier morning hours on previous occasions, before he (RIVERS) would leave to sell drugs for the day. The CS observed RIVERS put numerous baggies of whatever drugs he (RIVERS) was going to sell for the day in a square box and leave the house. The CS advised he/she has been inside 217 Westwood Avenue with RIVERS with the baggies of drugs he (RIVERS) would sell. 217 Westwood Avenue is RIVERS' personal residence. RIVERS has owned 217 Westwood Avenue for 10 plus years. According to the Montgomery County Auditor's website, RIVERS has owned 217 Westwood Avenue since April 17, 2014.

132.    On January 22, 2026, TFO Miller and the RANGE TF utilized UC2 to conduct a controlled purchase of approximately 12 grams of fentanyl from RIVERS that took place around

24

140 West Norman Street in the City of Dayton, Ohio.

133.    Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone number 937-474-2208 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the Main Street area and call back.

134.    The UC2 called RIVERS back who directed UC2 to the West Norman Street area to complete the deal. Upon arriving near 140 West Norman Street, the UC2 parked near RIVERS' Nissan and the UC2 exited the vehicle. UC2 approached RIVERS' Nissan.

135.    The UC2 handed RIVERS recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

136.    The UC2 confirmed RIVERS was the person that sold the fentanyl to the UC2.

137.    The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

138.    On January 30, 2026, TFO Miller and the RANGE TF utilized UC2 to conduct a controlled purchase of approximately 10 grams of fentanyl from RIVERS that took place near 140 West Norman Street in the City of Dayton, Ohio.

139.    Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone number 937-474-2208 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the West Norman area.

140.    Upon arriving near 140 West Norman Street, the UC2 parked near RIVERS' Nissan and the UC2 exited the vehicle. UC2 approached RIVERS' Nissan and entered the passenger side.

141.    The UC2 handed RIVERS recorded buy funds and was given numerous baggies of

25

off-white powder of purported fentanyl.

142. The UC2 confirmed RIVERS was the person that sold the fentanyl to the UC2. It should be noted a silver Audi with Ohio license plate DOA5414 pulled up to the same location and parked behind RIVERS. When the drug deal was done with UC2, the driver of the Audi met with RIVERS at the passenger side of the Nissan, leaned in, and appeared to complete another deal. No enforcement action was taken on the driver of the silver Audi.

143. The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

144. On February 13, 2026, TFO Miller and the RANGE TF utilized UC2 to conduct a controlled purchase of approximately nine grams of fentanyl from RIVERS that took place near 140 West Norman Street in the City of Dayton, Ohio.

145. Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone number 937-474-2208 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the Neff Road area.

146. Upon arriving near Neff Road area, the UC2 parked in front of an 2425 Neff Road. An unknown female walked from the house and contacted someone at RIVERS's Nissan. The same female appeared to retrieve the purported fentanyl from RIVERS's Nissan and walk over to UC2..

147. The UC2 handed the female the recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

148. A search of law enforcement databases on 2425 Neff Road revealed ███████

26

█████████ as living there. UC2 showed a picture of █████████ and positively identified her as the person who completed the drug deal.

149.   The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

150.   On February 19, 2026, TFO Miller and the RANGE TF utilized UC2 to conduct a controlled purchase of approximately 10 grams of fentanyl from RIVERS that took place at PREMESIS.

151.   Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone number 937-474-2208 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the Westwood Avenue area.

152.   Upon arriving near 217 Westwood area, the UC2 parked in the alley way behind 217 Westwood. RIVERS walked from the detached garage and contacted with UC2 at UC2's vehicle. The UC2 handed RIVERS recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

153.   The UC2 confirmed RIVERS was the person that sold the fentanyl to the UC2.

154.   The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

155.   On February 25, 2026, the RANGE TF utilized UC2 to conduct a controlled purchase of approximately nine grams of fentanyl from RIVERS that took place near 2425 Neff Road in the City of Dayton, Ohio.

156.   Prior to and subsequent to the deal, The UC2 contacted RIVERS at telephone

27

number 937-474-2208 and ordered a quantity of fentanyl. The UC2 was equipped with monitoring and recording equipment. RIVERS directed the UC2 to the Neff Road area.

157. Upon arriving near Neff Road area, the UC2 parked in front of 2425 Neff Road. An unknown female walked from the house and contacted someone at RIVERS's Nissan. The same female appeared to retrieve the purported fentanyl from RIVERS's Nissan and walk over to UC2.

158. The UC2 handed the female the recorded buy funds and was given numerous baggies of off-white powder of purported fentanyl.

159. A search of law enforcement databases on 2425 Neff Road revealed ███ ███ as living there. UC2 showed a picture of ███ nd positively identified her as the person who completed the drug deal.

160. The purchased substance was sent to the Miami Valley Regional Crime Lab and confirmed to be fentanyl.

161. A "MO" (Modus Operandi) of RIVERS and his drug trafficking operation has been identified through various investigative techniques, including but not limited to real-time physical and electronic surveillance. Based on my training and experience and the training and experience of other law enforcement assisting with the investigation, law enforcement believes the following:

    a. RIVERS utilizes a minimum of three vehicles to deliver narcotics throughout the Greater Dayton area daily. Agents have identified the previously listed Nissan Sentra, Chevy Silverado, and Audi Q5 (referred to as RIVERS' Nissan, RIVERS' Silverado, and RIVERS' Audi).

28

b. RIVERS will often change vehicles numerous times a week possibly attempting to conceal his activities or evade law enforcement.

162. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, know the following:

a. It is common practice for drug traffickers to hide their assets, addresses, telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the

29

transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them and control over them.

g.  It is common for drug traffickers to provide false information to law enforcement officials regarding their true identity and the address of their actual residence.

h.  It is common that persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

When drug traffickers typically amass large proceeds from the sale of drugs, they attempt to hide the true source of these proceeds/profits, otherwise known as laundering the money. To accomplish this, drug traffickers often times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds including real estate firms and other purported legitimate business fronts.

i.  Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported,

30

drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, U.S. mail, and rental/private automobiles.

j.  It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates and co-conspirators in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

k.  Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and/or posted social media internet sites.

l.  Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, controlled substances, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

m.  Drug traffickers frequently maintain hidden compartments (also known as "traps") within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the

31

evidence in safes.

n.   The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.

o.   Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in. or accessed by the cellular phone.

p.   Drug traffickers frequently ship drugs via the U.S. Mail, United Parcel Service (UPS) and/or FedEx Delivery Services. These packages often contain fictitious name(s) or return addresses, incomplete return addresses, no return addresses, the return address is the same as the consignee address, or the return address does not

32

match the place from where the parcel was mailed.  The parcels are often addressed to a fictitious person or business in which you cannot associate the name with the address through online government/law enforcement databases or searches.  Such parcels commonly originate from so-called source states to include: Arizona, Oregon, Nevada, California, Colorado, Michigan, Texas, Washington and Florida.

163.    If it is nonetheless determined that it is possible that the things described in this warrant could be found on any computers or storage media, the warrant applied for would permit the seizure of those items as well.

## CONCLUSION

164.    Based upon my training and experience, I know that drug dealers often keep proceeds of their criminal activity – such as cash, jewelry deeds, reflecting property that they own, receipts documenting purchases made using drug proceeds – at their residences and locations used to receive drug shipments.  In addition, I know that drug dealers also keep drugs and drug trafficking related items – such as drug ledgers, cellular telephones, bills for cellular telephones – at their residences and locations used to receive drug shipments.  I also know that to protect these valuables, drug dealers also keep firearms and security systems at their residences and locations used to receive drug shipments.

165.    Based upon the facts set forth in this Affidavit, there is probable cause to believe that the PREMISES contains evidence of a crime; contraband, fruits of crime, or other items illegally processed; property designed for use intended for use; or used in committing a crime – namely, violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled

33

substance(s)); 21 U.S.C. § 843(b) (use of a communication facility to commit a Title 21 offense);

21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

Respectfully submitted,

**TYLER J SIMPSON** Digitally signed by TYLER J SIMPSON
Date: 2026.03.09 10:42:50 -04'00'

Tyler Simpson
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me by reliable electronic means, specifically, by telephone, in accordance with Fed. R. Crim. P. 4.1, on March 9th , 2026.

UNITED STATES MAGISTRATE JUDGE

34

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is 1750 Princeton Drive, Dayton Ohio 45406 (the "PREMISES"), to include all outbuildings, garages, and vehicles within the curtilage. PREMISES is further described as a single-story, single-family house and is pictured below. The exterior walls consist of red brick around the residence. There is white framing around the front windows and a brown front door with a black mailbox affixed to the right of the front door, a small front porch constructed with concrete, and a white garage door located to the right on the front side of the **PREMISES**.



The search of the aforementioned PREMISES shall include any and all containers and safes within the PREMISES.

# ATTACHMENT B

*Property to be seized*

1. All records relating to violations of 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substance(s)), and 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), occurring on or after April 1, 2025 including:

   a. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

   b. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

   c. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

   d. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items

evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

e. Electronic equipment such as cellular telephones, pagers, electronic organizers, storage medium, police scanners and two-way radios.

f. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

g. Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity.

h. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

i. Indicia of occupancy, residency, and/or ownership of the PREMISES and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

j. Illegal drugs, including, but not limited to methamphetamine and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

k. Firearms and ammunition.

l. Records, documents, or items reflecting indicia of occupancy or ownership at a residence.

2

m. Records and information relating to the identity or location of the suspects.

2. Any computers, cellular telephones, tablets or electronic devices used as a means to commit the violations described above or that may contain the above-described documents or items in electronic format.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disk drives or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).